# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

RASHELL ORTIZ,

CRIMINAL ACTION

NO. 24-13

**Pappert, J.**                                                         **March 18, 2025**

## <u>MEMORANDUM</u>

For two years, Rashell Ortiz and her live-in boyfriend and now father of her child Orvil Cataquet Jr. carried out a scheme to defraud hundreds of people seeking to purchase luxury goods, including purses and shoes.  Specifically, they would advertise the sale of these products on online sales platforms and tell would-be purchasers to text them directly to arrange a lower price.  When the unsuspecting victims took the bait, Ortiz and Cataquet would convince them to pay *via* peer-to-peer payment platforms like Zelle, ostensibly to avoid fees associated with transactions through the sales platforms.  The victims paid the money and never received what they paid for.  The scheme worked well: Ortiz and Cataquet defrauded their victims of over $130,000, most of which they spent on rent, food delivery and video games.

Some of the victims, however, did not go quietly, filing complaints with law enforcement in Plumstead Township, Pennsylvania and other localities around the country.  The FBI investigated and in January of 2024, Ortiz was charged by indictment with six counts of wire fraud.  Two and a half months later, Cataquet was charged with six counts of wire fraud through an information that largely mirrored the Ortiz indictment.  He quickly pleaded guilty, pursuant to a written guilty-plea

agreement, to all charges.  During Cataquet's guilty-plea hearing, the Government stated the factual basis for his plea.  It laid out the entire scheme and explained that Cataquet and his "partner," Ortiz, were equal and co-participants in all aspects of the sordid affair.  Cataquet told the Court, under oath, that the Government "correctly and accurately summarized the facts of the case."

Ortiz chose to go to trial.  Over the course of two days, the Government presented overwhelming evidence of her guilt, including records linking bank accounts, payment-platform accounts and phone numbers under Ortiz's name to the scheme; sixty-seven videos featuring identical footage of a Gucci bag and voiceovers in which Ortiz identifies the would-be purchasers by name; bank records showing no expenses consistent with a legitimate luxury-item resale business; and two separate admissions to law enforcement by Ortiz that she participated in and understood the nature of the scheme.  At the conclusion of the Government's case, Ortiz nevertheless orally moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  The Court took the motion under advisement, after which the jurors heard closing statements, were given their instructions and quickly convicted Ortiz on all counts. The Court subsequently denied the Rule 29 motion.

Ortiz now moves for reconsideration of that decision, claiming that the evidence was not sufficient to show that she knowingly participated in the alleged scheme nor that she had the specific intent to defraud.  In the alternative, she argues that for three separate reasons, the interests of justice require a new trial pursuant to Federal Rule of Criminal Procedure 33.  She says the verdict was against the weight of the evidence,

that the Court erred when it admitted evidence of Zelle payments[1] made by individuals who never testified to the reason for the payment, and that the Court "effectively precluded" her from introducing a prior statement by Cataquet to law enforcement in which he attempted to take sole responsibility for the scheme.

The Court denies the motion in all respects. The Government presented evidence far more than sufficient to sustain Ortiz's convictions and disturbing the jury's verdict would contravene the interests of justice. The Court also did not err in admitting evidence of Zelle payments by non-testifying victims. Neither did the Court erroneously "preclude" Ortiz from introducing Cataquet's prior statement — it never ruled on the matter, and in any event Ortiz cannot demonstrate that the "ruling" she imagines would have been erroneous or affected the trial's outcome, most obviously because Cataquet's prior statement was inadmissible.

I

Rule 29 of the Federal Rules of Criminal Procedure provides that a court, "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient if no "rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). This standard is "highly deferential" to the jury's verdict. *Id.* It requires courts to view the entire record — not just isolated parts — "in the light most favorable to the prosecution." *Id.* (quoting *Brodie*, 403 F.3d at 133).

---

[1]    The Court uses "Zelle payments" to collectively refer to payments made on multiple peer-to-peer payment platforms like Zelle, Venmo, CashApp, Paypal and Apple Pay.

Courts "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Id.* (cleaned up) (quoting *Brodie*, 403 F.3d at 133). To avoid "act[ing] as a thirteenth juror," a court must uphold any verdict that "does not 'fall below the threshold of bare rationality.'" *Id.* at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)); *see also United States v. Jacobs*, 21 F.4th 106, 112 (3d Cir. 2021). Ortiz argues that even giving the jury's verdict its due deference, the Government did not introduce sufficient evidence to sustain a conviction for wire fraud.[2]

The offense of wire fraud has three elements: (1) the defendant knowingly and willfully participated in a scheme or artifice to defraud; (2) the defendant acted with the specific intent to defraud; and (3) the defendant used, or caused to be used, an interstate wire in furtherance of the scheme or artifice. 18 U.S.C. § 1343; *United States v. Scarfo*, 41 F.4th 136, 198 (3d Cir. 2022). Ortiz does not dispute that the Government put forth adequate evidence that from October 2019 through at least August 2021, *someone* ran a scheme to defraud people by listing luxury items on online marketplaces, then convincing the would-be buyers to send payment for the items through peer-to-peer payment platforms, and then never sending the buyers the items for which they paid. *See, e.g.*, (Tr. Jury Trial Dec. 10 at 36:1–37:1, 89:14–15, 97:1–23, 117:22–118:13, 144:11–145:7. 146:20–24, ECF No. 69); (Trial Ex. 105 at 4–8); (Trial Ex. 501–67.) She

---

[2] Through her insufficiency-of-the-evidence arguments, Ortiz seeks reconsideration of the Court's denial of her prior motion for judgment of acquittal. (Def. Mot. 4, ECF No. 59.) Motions for reconsideration "empower courts to change course when a mistake has been made." *United States v. Dupree*, 617 F.3d 724, 732–33 (3d Cir. 2010). A court may only grant such a motion (1) to apply changed law, (2) to apply previously unavailable evidence, or (3) to prevent manifest injustice. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Ortiz raises no new law or evidence, and for the reasons explained there is no manifest injustice to prevent.

argues only that the Government failed to present evidence that *she* (1) knowingly participated in the scheme or (2) acted with the specific intent to defraud.  *See* (Def. Mot. 6–8.)

A

Beginning with the "knowing participation" element, the crux of Ortiz's argument is that the Government did not introduce any evidence disproving the possibility that someone else, namely Cataquet, carried out the scheme without help from Ortiz.  (*Id.*)  She acknowledges, as she must, that the Government introduced "an abundance of evidence linking fraudulent activity to payment platforms, bank accounts, and phone numbers in Ms. Ortiz's name."  (*Id.* at 6.)  But as she sees it, the fact that the Government's evidence also linked Cataquet to the scheme means the Government was obligated to affirmatively disprove the Cataquet-did-it-alone theory.  Leaving aside whether the Government actually had such an obligation, evidence of Ortiz's active and knowing participation in the scheme abounds.

For starters, the Government introduced *sixty-seven* videos with identical footage of a Gucci Marmont bag and a voice in the background of sixty-six of those videos saying "hi [buyer], my name is Selene [or, sometimes, Jennifer] and this is my Gucci Marmont bag."  (Trial Ex. 501–567.)  The Government also introduced several videos of Ortiz speaking, (Trial Ex. 571–83), allowing the jury to compare her voice to the voice behind the Marmont-bag videos and conclude that they were the same.  The Marmont-bag videos were each created during the scheme's lifespan, so the jury surely could have concluded that the videos were part of that scheme.  *See* (Trial Ex. 707).  And the videos also showed Ortiz's knowledge of the scheme's fraudulent nature — the jury could

5

reasonably infer that she knew that all sixty-seven video recipients could not have received the same bag.[3]  That inference is particularly justified because the Government introduced evidence that neither Ortiz nor Cataquet incurred any expenses consistent with a luxury-bag resale business, (Tr. Jury Trial Dec. 11 at, *e.g.*, 64:21–65:21, 74:25–75:9, 94:10–19, 151:17–152:2, 154:24–155:2, ECF No. 55), meaning Ortiz likely did not have multiple Gucci Marmont bags to sell.  Plus, the monies made through the Zelle payments were the near-exclusive source of income for Ortiz and Cataquet, (*id.* at, *e.g.*, 75:10–16, 94:24–95:1, 147:3–148:11, 152:3–6, 155:3–6), so it's reasonable to conclude that she knew her videos induced numerous "purchases."

The Government's evidence also demonstrated that numerous acts in furtherance of the scheme originated from Ortiz's iCloud account.  The account in question is associated with the email address Rashell_Ortiz24@iCloud.com, contained numerous selfies of Ortiz (and none of Cataquet), and was created years before the scheme originated.  *See* (*id.*); (Tr. Jury Trial Dec. 11 at 164:20–165:20); (Trial Ex. 602-1).  The jury could thus conclude that Ortiz (rather than Cataquet under Ortiz's name) opened and operated the iCloud account herself.  From that iCloud account, FBI Agent Joseph McGinn retrieved screenshots of the same Gucci Marmont bag featured in the videos described above, screenshots showing drafts of online listings similar to the ones that deceived the five witnesses who testified to having been defrauded, and

---

[3]    Ortiz urges that even if she did record and send the videos, the Government never introduced evidence that the recipients of the videos paid for but did not receive a Gucci Marmont bag.  (Def. Mot. 7.)  But the Government did introduce such evidence: Agent McGinn testified that twenty-four of the buyer names heard in the videos could be linked to Zelle transactions initiated by individuals with the same or similar names shortly after the relevant Marmont-bag video was created.  (Tr. Jury Trial Dec. 11 at 170:16–171:9); (Trial Ex. 707.)  The jury could infer that all twenty-four "purchasers" could not have received the same bag.  And in any event, the Government did not have to prove that any individual was actually defrauded, *see Neder v. United States*, 527 U.S. 1, 25 (1999), so evidence that the video recipients paid for but did not receive a bag was not necessary.

screenshots showing a seller having cancelled sales of a Gucci Marmont bag after buyers attempted to purchase the bags through the sales platforms on which the bag was listed. (Tr. Jury Trial Dec. 11 at 181:8–183:14, 187:6–188:22 191:8–193:18); (Trial Ex. 404–407.) In addition, Agent McGinn recovered from the inbox of Rashell_Ortiz24@iCloud.com dozens of emails addressed to Ortiz concerning bank accounts and payment-platform accounts used in furtherance of the scheme. (Tr. Jury Trial Dec. 11 at 177:3–180:18); (Trial Ex. 409.) These emails contained notifications about account activity such as account openings and receipt of Zelle payments. (Trial Ex. 409.)

The Government also introduced evidence that Ortiz twice *admitted* her participation in the scheme. Plumstead Township Detective Kevin Larkin testified that he received an email in September of 2020 from Rashell_Ortiz24@iCloud.com confessing to and apologizing for taking money from "victims." (Tr. Jury Trial Dec. 10 at 180:18–184:19); (Trial Ex. 402.) Agent McGinn later retrieved a draft of this email from the notes application associated with Ortiz's iCloud, (Tr. Jury Trial Dec. 11 at 186:12–187:5), suggesting that Ortiz was indeed the author. And Agent McGinn also testified that in February of 2023, Ortiz told him over the phone that she sent text messages to victims.[4] (Tr. Jury Trial Dec. 11 at 198:25–200:2.) According to McGinn, Ortiz also spoke as if she knew what fraudulent activities he was inquiring about even

---

[4]     Ortiz makes much of the fact that she also told McGinn that Cataquet "made her" send the texts. (Tr. Jury Trial Dec. 11 at 199:15–18.) It's not clear what Ortiz meant given that she never mentioned any physical coercion or violence, (*id.* at 199:19–200:1), and that her counsel conceded Ortiz could not make out a duress defense, (Tr. Jury Trial Dec. 5 at 5:5–19, ECF No. 66). And even assuming the jurors believed that Ortiz faced some degree of pressure by Cataquet, they need not have disregarded all other evidence that Ortiz participated in the scheme knowing of its fraudulent nature.

before he revealed the details of those activities.  (*Id.* at 199:5–13. 200:6–12, 202:15–23.)  Viewed in the light most favorable to the Government, the bag videos, iCloud-account evidence and admissions are more than sufficient for the jurors to have found that Ortiz participated in the scheme with knowledge of its fraudulent nature.

## B

With respect to the specific-intent element, Ortiz merely points the Court to "the same reasons identified above as to why the evidence failed to prove . . . knowledge of the scheme."  (Def. Mot. 8.)  But again, Ortiz's purported reasons why the Government failed to prove knowledge were swamped by the evidence.  And the specific intent to defraud "may be found from a material misstatement of fact made with [at least] reckless disregard for the truth."  *United States v. Hannigan*, 27 F.3d 890, 892 n.1 (3d Cir. 1994) (citing *United States v. Boyer*, 694 F.2d 58, 59–60 (3d Cir. 1982)).  The jurors could have surely concluded that Ortiz made knowingly or at least recklessly false statements while participating in the scheme.  For example, the jury could have found that when she texted with the would-be purchasers and told them she would ship the bags once the purchasers transferred the money, *e.g.*, (Trial Ex. 102 at 2, 104 at 1, 105 at 1, 106 at 8), she knew that neither she nor anyone else was actually going to ship any bags.[5]

---

[5]     Though Ortiz doesn't explicitly purport to challenge the Government's evidence with respect to the third element of wire fraud (causing an interstate wire transfer), she comes close at times to doing so.  She says "[e]ven if a reasonable juror could have concluded that Ms. Ortiz engaged in some fraudulent activity given the scope of the Government's evidence, the Government failed to prove that Ms. Ortiz participated in or even knew about the transactions involving [testifying witnesses]."  (Def. Mot. 7.)  She seems, in other words, to say that the Government never introduced evidence that Ortiz was the one who sent the texts that induced the the wire transfers included in the indictment.  But the Government did introduce, through Agent McGinn, Ortiz's admission to having sent text messages to at least some victims.  And the evidence further linked her to the texts received by the particular victims in the indictment.  For example, her name appeared in the recipient line of the Zelle confirmation that M.M. (Victim 1 in the indictment) received.  (Trial Ex. 102 at 5.)  And the

II

In the alternative, Ortiz seeks a new trial pursuant to Federal Rule of Criminal Procedure 33.  Rule 33 provides a more capacious standard of review than Rule 29, permitting district courts to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Courts grant new trials pursuant to Rule 33 for various reasons, including a verdict against the weight of the evidence, newly discovered evidence, misconduct and trial error.  *See* Wright and Miller, *Federal Practice and Procedure* §§ 582–89 (5th ed. June 2024 update).  Ortiz here contends that a new trial is warranted for three reasons: (1) the verdict was against the weight of the evidence; (2) the Court erred admitting evidence of Zelle payments made to Ortiz and/or Cataquet by individuals who did not testify at trial; and (3) the Court "effectively precluded" her from introducing a prior statement by Cataquet claiming that he carried out the scheme alone.  (Def. Mot. 7–14.)

A

When reviewing a Rule 33 motion asserting that the verdict was against the weight of the evidence, courts need "not view the evidence favorably to the Government" like they do under Rule 29.  *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)).  Such motions, however, are "disfavored and should be 'granted sparingly and only in

---

text messages that R.W. (the other victim in the indictment) and the other testifying victims received followed a similar pattern to the texts received by M.M. and were consistent with having come from a woman.  *See* (Trial Ex. 102–07); (Tr. Jury Trial Dec. 10 at 45:20–22, 67:18–68:2, 71:24–72:6, 98:1–17, 110:1–6, 119:21–120:2, 147:15–16, 172:2–14.)  Ortiz suggests that Cataquet could have written the texts while pretending to be a woman, and while that's one possible inference the jury could have drawn, it was not one the evidence required and not the one the jury ultimately drew.  The jury could have thus concluded that Ortiz was the author of the texts that induced the interstate wire transfers charged in the indictment.

exceptional cases.'" *Id.* (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). Specifically, a court may "order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted.'" *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quoting *Johnson*, 302 F.3d at 150).

Ortiz merely refers back to the same arguments she raised in seeking a judgment of acquittal under Rule 29, adding that while "[t]he evidence may have established a scheme to defraud[,] . . . there are too many unknowns as to Ms. Ortiz's level of involvement and [] the scope of the actual fraud." (Def. Mot. 9–10.) But as explained previously, Ortiz's fingerprints are all over the fraud scheme. Her name was on numerous bank accounts, phone numbers and payment-platform accounts used in the scheme. Her personal iCloud account was a primary tool of the scheme. She recorded videos to further the scheme. And she admitted to texting the victims. Based on all the evidence it saw and heard, the jury did not convict an innocent person.

### B

Ortiz's second argument for a new trial is that the Court erred when it permitted the Government to introduce evidence of Zelle payments to Ortiz (and Cataquet) that were not mentioned in the indictment and were made by purported victims who did not testify at trial to their reasons for sending the payments. (Def. Mot. 14.) She sought exclusion of this evidence *in limine* and again at trial, often for shifting reasons. *See* (Mot. in Lim., ECF No. 40); notes 6 & 8 *infra*. Her primary argument against admissibility continues to be that any evidence of Zelle payments by a non-testifying

victim was either irrelevant and thus barred by Federal Rule of Evidence 402 or unduly prejudicial under Rule 403.  (Mot. in Lim. 2–3, ECF No. 40); (Def. Mot. 14.)  The evidence, however, was properly admitted, and the "interests of justice" do not require a new trial.  Fed. R. Crim. P. 33(a).

1

First, the Zelle-payment evidence was relevant.  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Relevance is "not a high standard."  *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999).  The proponent need only demonstrate that the evidence is "a step on one evidentiary route to [an] ultimate fact."  *Old Chief v. United States*, 519 U.S. 172, 179 (1997).

Evidence of all Zelle payments to Ortiz's and Cataquet's accounts tended to make numerous facts of consequence more likely.  First of all, evidence of a high number of incoming Zelle payments for luxury bags tended to prove the existence of a scheme to procure Zelle payments by pretending to sell luxury bags — the very scheme alleged in the indictment.  Evidence that those payments went to bank accounts owned by Ortiz or Cataquet also tended to show that Ortiz participated in that scheme.  And evidence of a high volume of transactions over a lengthy period — especially in combination with evidence that Ortiz and Cataquet never incurred expenses consistent with a legitimate business — tended to show that Ortiz knew of the scheme's fraudulent nature.

Counsel also argued that the Government presented no "evidence, circumstantial or otherwise, that would link [any of the Zelle payments at issue] to an attempted

11

purchase of a bag." (Tr. Jury Trial Dec. 10 at 244:22–24.) Though not invoking Rule 104(b) explicitly, this argument implicates conditional relevancy; that is, the relevance of contested Zelle payments depended on whether those payments were meant to be in exchange for a luxury bag. But the Government presented evidence from which a reasonable juror could find by a preponderance that the Zelle payments were indeed meant to be in exchange for a bag. *See* Fed. R. Evid. 104(b); *United States v. Browne*, 834 F.3d 403, 409 (3d Cir. 2016).

The Government presented evidence that the names of twenty-four non-testifying payors matched a name that could be heard in a Marmont-bag video, s*ee* (Trial Ex. 707); (Tr. Jury Trial Dec. 11 at 170:16–171:9), suggesting that those twenty-four payors were attempting to purchase the Marmont bag. The Government also showed that the other Zelle payments shared several characteristics with those made by the five testifying victims and by the payors who could be linked to a Marmont-bag video. For example, the contested Zelle payments occurred during a similar period, were for similar amounts, and were made using similar payment platforms as the payments that were linked to bag videos or supported by testimony. *Compare* (Trial Ex. 701), *with* (Tr. Jury Trial Dec. 10 at 89:14–15, 117:22–118:13), *and* (Trial Ex. 707.) Accordingly, a rational juror could find that those payments were for a luxury bag, so evidence of the payments was relevant.

2

Once a court determines that evidence is relevant, Rule 403 permits the court to nevertheless exclude it on the ground that its "probative value is substantially outweighed by a danger of," *inter alia*, "unfair prejudice." Fed. R. Evid. 403. "Unfair

prejudice" is the tendency to induce the factfinder into convicting the defendant on some basis other than guilt of the crime charged. *Old Chief*, 519 U.S. at 180; *see also United States v. Bergrin*, 682 F.3d 261, 279 (3d Cir. 2012) (Unfair prejudice is prejudice "based on something other than [the evidence's] persuasive weight."). Rule 403 thus "does not protect defendants from devastating evidence in general." *United States v. Heatherly*, 985 F.3d 254, 266 (3d Cir. 2021). Analysis under Rule 403 starts with "a presumption of admissibility," *United States v. Claxton*, 766 F.3d 280, 302 (3d Cir. 2014), and should only be used "sparingly" to exclude evidence, *Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir.1992).

Counsel struggled during the arguments to articulate (and failed to clarify in this motion) precisely what risk of unfair prejudice evidence of the contested Zelle payments could present. In its motion *in limine*, the defense argued that "the Government would have the jury assume that because the Zelle transactions involving the five testifying victims and Ms. Ortiz are allegedly fraudulent, then all Zelle transactions involving Ms. Ortiz are fraudulent." (Def. Mot. in Lim. 3.) But this is merely a restatement of the conditional-relevancy argument the Court rejected above — i.e., that the jury can't reasonably infer that *all* Zelle payments to Ortiz were fraudulently induced by promises of luxury bags simply because five people testified that Ortiz tricked *them* into sending her money for a bag. Because the "burden is placed on the party opponent" to raise the "reasons supporting an objection," McCormick on Evidence § 52 (9th ed. Feb. 2025 update), counsel's failure to articulate any risk of unfair prejudice should doom the objection.[6]

---

[6]    The defense also appeared to suggest that evidence of the Zelle payments made by non-testifying victims would unfairly prejudice Ortiz by "shifting the burden" to Ortiz to prove that the

The Court can, however, envision a risk of unfair prejudice from the numerous Zelle payments. Specifically, because the jurors saw evidence of over three hundred purportedly fraudulently induced Zelle payments to Ortiz, they might have accepted less than proof beyond a reasonable doubt on the third element of wire fraud — causing an interstate wire transfer. Said another way: the jury saw evidence of so much fraud by Ortiz that they might have convicted her without paying much worry to whether she caused the five specific wire transfers charged in the indictment.[7]

That risk, however, did not substantially outweigh the probative value of the contested Zelle payments. As the Court explained when it allowed the evidence, "[e]very single [Zelle] transaction that comes into [Ortiz's and Cataquet's] accounts is probative of [Ortiz's] knowledge [of] and willful participation in the scheme." (Tr. Jury Trial Dec. 10 at 246:7–9.) That is, every time the jury saw evidence of a new Zelle payment to Ortiz (and/or Cataquet), the jury had more reason to believe that Ortiz was a knowing participant in the fraud scheme. And Ortiz's knowledge was the core dispute in the case. *See supra* Parts I and II.A. She cannot profess ignorance of the scheme

---

payments were legitimate. (Tr. Jury Trial Dec. 9 at 18:18–19:3, ECF No. 68.) That argument, aside from not really being about "unfair prejudice" under Rule 403, is wrong. The jury was instructed at the close of trial that the prosecution retained the burden to prove all elements of the offense beyond a reasonable doubt; Ortiz never had the burden to prove her innocence. *See Cnty. Ct. of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 157 (1979); *Baghdad v. Att'y Gen. of United States*, 50 F.4th 386, 389–90 (3d Cir. 2022).

[7]    At trial, the Court also envisioned a risk of prejudice if the Government were permitted to sum up the Zelle transactions and emphasize the total number of people victimized by the scheme and the total dollar amount in fraud loss. *See* (Tr. Jury Trial Dec. 10 at 11:22–12:9.) Emphasis on the "result" of the scheme might have induced the jurors to convict Ortiz based on the total harm caused by the scheme and consequent total benefit to Ortiz, ignoring the question of Ortiz's *knowing participation* in that scheme. *See* (*id.*) To the extent the Court erred in threading the needle by precluding discussion of the aggregate number of victims and total amount of the fraud, the mistake was in Ortiz's favor because the ruling prevented the Government from arguing that anyone who receives $130,000 over two years knows where that money is coming from. *See* (Tr. Jury Trial Dec. 9 at 34:20–35:19.)

while simultaneously discounting the probative value of the Government's evidence to the contrary.  *Cf. United States v. Repak*, 852 F.3d 230, 247 (3d Cir. 2017) (holding that evidence showing defendant's knowledge and intent, which the defendant made "the centerpiece of the trial," had "significant" probative value).[8]

C

Ortiz's third ground for a new trial is the least conventional and most complicated.  In essence, she complains the Court "effectively precluded" her from introducing, pursuant to an exception to the rule against hearsay, a prior statement by Cataquet to Agent McGinn, which would have first required the Court to decide whether and how Cataquet could invoke his Fifth Amendment privilege and thus be "unavailable" for purposes of the exception.

As the Government's case was winding down, and on the heels of the Court finally putting to bed the defense's shifting arguments about the contested Zelle payments, counsel announced a new plan: to call Cataquet to "testify" that he was solely responsible for the fraud scheme and that Ortiz had nothing to do with it.  (Tr. Jury Trial Dec. 11 at 9:11–9:24; 10:12–25.)  But putting Cataquet on the stand was a complex proposition because he had previously agreed, under oath during his own guilty-plea colloquy, that he and Ortiz carried out the scheme together.  (*Id.* at 9:24–

---

[8]    Counsel originally argued that the evidence of uncharged Zelle payments was "other acts" evidence subject to Rule 404(b), but rightly abandoned that theory.  *See* (Tr. Jury Trial Dec. 9 at 11:25–12:5.)  Zelle payments by non-testifying victims were "intrinsic" to the offense, even though they weren't set out specifically in the indictment, because they were evidence of the scheme alleged in the indictment.  *See, e.g.*, *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002) (recognizing that the district court erred in applying Rule 404(b) to exclude evidence of uncharged conduct that was part of the charged scheme to defraud); *United States v. Loftis*, 843 F.3d 1173, 1176–77 (9th Cir. 2016) ("The crime charged in a wire fraud prosecution … includes not only the specific executions of the scheme alleged … but also the overall scheme."); *United States v. Smith*, 685 F.2d 1293, 1295–96 (11th Cir. 1982) (holding that Rule 404(b) did not govern evidence of uncharged insurance claim because it proved the existence of alleged scheme to defraud insurance company).

10:10.) So if he were to contradict himself under oath now, he could open himself up to a perjury charge — either for lying to the jurors now to the Court previously. *See* (*id.*)

Purportedly concerned about the presently unrepresented Cataquet's exposure, the defense suggested the Court hold a hearing outside the presence of the jury and allow Cataquet the opportunity to invoke his Fifth Amendment privilege against self-incrimination. (*Id.* at 14:8–18, 16:8–11.) According to counsel, Cataquet was entitled to take the Fifth and become "unavailable," paving the way for the admission of his prior "statement against interest." (*Id.* at 20:19–24); *see* Fed. R. Evid. 804(a), 804(b)(3). Through cross-examination of Agent McGinn, the defense would show the jurors a statement Cataquet made to McGinn before he was charged claiming sole responsibility for the fraud scheme. (Tr. Jury Trial Dec. 11 at 10:18–25, 23:17–23); (Def. Mot. Ex. 1, ECF No. 59-1.)

This was all, of course, a long way from the "pretty straightforward" matter counsel claimed it to be. (Tr. Jury Trial Dec. 11 at 25:14–16.) The Court attempted to process the issues that the defense's plan could raise, their ramifications and the time it would take to properly handle everything — all against the backdrop of having told the jurors the prior afternoon (with the defense's blessing) that the presentation of the evidence, even with the defense presenting a case, would conclude that day. *See* (*id.* at 25:1–13.) The Court first sought to determine whether Cataquet needed a lawyer present. (*Id.* at 13:12–13, 15:6–8, 19:18.) When asked whether Cataquet had been counseled about the possibility of a perjury charge and his Fifth Amendment rights, counsel "assume[d]" the lawyer who had represented him in his own case had spoken to him, (*id.* at 6–9), and then stated that actually, the defense had received an email from

Cataquet's prior lawyer telling them she had "advised" Cataquet on the risk of exposing himself to a perjury charge, (*id.* at 10:8–11, 15:13–18). Counsel then suggested that the Court might have to reappoint that lawyer (whose availability was unknown), (*id.* at 13:14–17), and then later argued that Cataquet's lawyer didn't have to be there at all, (*id.* at 20:4–9). This was all, to be charitable, a fairly bizarre presentation that left the Court with little confidence that anything could be done without first finding Cataquet a lawyer to represent him in person.

Also thinking out loud (and doing some legal research "on the fly"), counsel for the Government pointed out that whether Cataquet would be entitled to invoke the Fifth Amendment at all was not the simple proposition defense counsel assumed. (*Id.* at 21:15–21.) The Government also objected to the defense's suggestion that Cataquet should invoke the Fifth Amendment outside the presence of the jury, stating that if Ortiz wanted to pin the whole scheme on Cataquet, he was "absolutely going to get up there and say something in front of this jury so they can hear him and see him." (*Id.* at 37:10–38:4.) And the Government indicated that it needed time to work through the rest of the legal issues, including whether Cataquet's statement actually fell within Rule 804(b)(3)'s hearsay exception for statements against interest, and whether it might run afoul of *Bruton v. United States*, 391 U.S. 123 (1968) if it introduced Cataquet's plea colloquy to counter the introduction of his statement to Agent McGinn. (*Id.* at 27:4–11, 38:19–39:2.)

The defense's representation that this was all so "straightforward" took another hit when counsel claimed to have a decision from the Third Circuit Court of Appeals, *United States v. Adams*, 759 F.2d 1099 (3d Cir. 1985), prescribing the "procedure" for

17

how this was all to be done.  (*Id.* at 16:8–11.)  But when asked what the case instructed, counsel asked for the "Court's indulgence" so she could read, obviously for the very first time, sections of the opinion someone else had highlighted for her.  (*Id.* at 16:10–18:17.)[9]  The defense was disorganized and neither they, the Government nor the Court had a handle on what to do and how to do it in a way that best protected Ortiz's rights (and now Cataquet's too), was fair to the Government, and most importantly gave the Court the information it needed to correctly rule on the many issues implicated.  The defense's disorganization was disappointing given that they knew about Cataquet's prior statement well in advance of trial, (*id.* at 29:4–21), and could have had their ducks in a row before the last minute.

The Court urged counsel to more thoroughly assess their strategy before saddling everyone with issues that would necessitate additional briefing, research and probably a hearing, all on what the jurors had been told would be the final day of evidence.  (*Id.* at 19:23–20:3, 25:1–13, 28:9–14, 40:23–42:13.)  The Court also opined that it seemed fair for the Government to "have free reign" to cross-examine Cataquet if he took the witness stand, (*id.* at 40:7–9), and the Court was skeptical that counsel had thought through whether Cataquet's testimony would benefit Ortiz's case, (*id.* at 40:7–9); *see also* (*id. a*t 42:3–13.)  Counsel conferred with Ortiz and then told the Court they did not intend to call Cataquet after all.  (*Id.* at 42:18–20.)

---

[9]      Counsel should have read *Adams* before presenting her "strategy."  The section of the decision she cited addresses primarily a Confrontation Clause issue using the pre-*Crawford v. Washington*, 541 U.S. 36 (2004) rules, and to the extent it's still relevant, *Adams* says only that a district court is "not required to rule on [a witness's] unavailability only after [the witness] ha[s] taken the [ ] stand in open court."  759 F.2d at 1107.  *Adams* thus acknowledges that witnesses sometimes take the Fifth in open court, and it provides no guidance about when a witness should or should not do so.  *Adams* also reinforces the propriety of having the witness's lawyer participate.  *See id.* at 1106.

Against this backdrop, the defense faults the Court for "severely inhibiting" Ortiz's case by "ruling" that "if Cataquet were to assert his Fifth Amendment privilege, he would have to do so . . . from the witness stand berated with questions from the prosecution in front of the jury," and contends that a new trial is warranted so they can employ the very strategy they raised and then abandoned. (Def. Mot. 10, 14.)[10] This argument depends on characterizing as a "ruling" the Court's statements to defense counsel that "if you get [Cataquet] up here, [the Government is] going to have free reign on him" and that "you haven't thought through[,] when [the Government] pull[s] out all the guns, how that's going to make your client look." (*Id.* at 13); *see* (Tr. Jury Trial Dec. 11 at 40:7–9, 42:3–5.)

Ortiz's argument relies on a faulty premise. The Court never ruled on anything while it, along with the parties, was trying to figure out what to do, and there is thus no trial "error" to cure. *See United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019). And even if the Court had ruled that Cataquet must take the Fifth in front of the jury, that ruling could not have "had a substantial influence on the outcome of the trial." *See id.*

---

[10]     Ortiz also claims that the Court "threatened to revisit prior evidentiary rulings." (Def. Mot. 13.) The Court did ask whether it would have to do so. (Tr. Jury Trial Dec. 11 at 39:3–5.) But its prior rulings were made before it was forced to contemplate how all the issues related to Cataquet might play out. Indeed, the Government also needed time to figure out how the defense's proposal would affect "the whole scope of the trial." (*Id.* at 39:6–10.) And revisiting evidentiary rulings is not atypical: "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce v. United States*, 469 U.S. 38, 41–42 (1984). "This is particularly true when the evidence is challenged as . . . prejudicial," *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997), which was the basis for at least one of the Court's prior evidentiary rulings in Ortiz's favor, *see supra*, n.6.

1

Ortiz's argument is meritless unless she can show that she actually sought and received a "ruling" from the Court. *See* Fed. R. Crim. P 51(b); Fed. R. Evid. 103(b). She cannot do so because her lawyers abandoned their strategy before the Court could rule.

To be sure, the Court did suggest — in response to the Government's declaration that if Ortiz were going to point the finger at Cataquet, "he's absolutely going to get up there and say something in front of this jury so they can hear him and see him" — that the Government's position seemed "fair." (Tr. Jury Trial Dec. 11 at 37:16–22.) It also stated that if the defense called Cataquet to the witness stand, the Government would "have free reign on him." (*Id.* at 41:21–23, 42:3–5). Subsequent research would have shown the Court's instinct to be incorrect — the better practice is to have witnesses invoke their Fifth Amendment privilege outside the presence of the jury. *See Douglas v. Alabama*, 380 U.S. 415, 420 (1965); 3d Cir. Model Crim. Jury Instrs. § 2.21.

But that was the whole point — and the source of the Court's growing frustration. The issues all needed to be defined, researched and possibly briefed before the Court could decide them. That work, along with the process of locating Cataquet's lawyer and potentially facilitating her (or a new lawyer's) participation, promised to be complex and time-consuming. And the defense offered little to no assistance despite having the burden to do so. *See* Fed. R. Crim. P. 51(b); Fed. R. Evid. 103(a); *see also Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446 (3d Cir. 1999) ("The reason we require parties to raise objections or waive them is to assure that the court's attention is drawn to potential errors before it is too late to remedy them.").

Indeed, Ortiz now faults the Court for suggesting that the jury should have an opportunity to see Cataquet invoke the Fifth Amendment, but her lawyer relied on a single case in response to that suggestion and wasn't prepared to explain what that case really stood for. (Tr. Jury Trial Dec. 11 at 16:8–19:6.)  Counsel also told the Court that whether the defense could pursue its plan at all was "completely within [the Court's] discretion," (*id.* at 36:20–23), despite now arguing that Ortiz's "constitutional right to present a defense" *required* that she be allowed to pursue the plan, (Def. Mot. 10).  *Cf. United States v. Seale*, 600 F.3d 473, 486–88 (5th Cir. 2010) (holding defendant did not preserve claim of error where counsel "affirmatively asked the trial court to apply an incorrect legal standard").

And with respect to the other issues the Court would have had to resolve, the defense offered no guidance at all.  For example, the defense acknowledged that, before deciding where and how Cataquet would take the Fifth, the Court needed to decide whether and to what extent Cataquet was entitled to do so.  *See* (Tr. Jury Trial Dec. 11 at 21:11–21:14); *see also* Third Cir. Model Crim. Jury Instrs. § 2.21.  Yet the defense apparently did not know that where perjury is the witness's fear, the Fifth Amendment only insulates him from self-incrimination with respect to perjury he has *already committed*.  *See* (Tr. Jury Trial Dec. 11 at 21:11–21:14.)  Indeed, "a future intention to commit perjury . . . is not by itself sufficient to . . . permit[] invocation of the Fifth Amendment."  *United States v. Apfelbaum*, 445 U.S. 115, 131 (1980).  "[T]here . . . is no doctrine of 'anticipatory perjury.'"  *Id.*; *see also Earp v. Cullen*, 623 F.3d 1065, 1070–71 (9th Cir. 2010); *United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir. 1986);

21

*United States v. Allmon*, 594 F.3d 981, 986–87 (8th Cir. 2010); *United States v. Vavages*, 151 F.3d 1185, 1192 n.3 (9th Cir. 1998).

Thus, to determine whether Cataquet could take the Fifth, the Court would have had to decide which was perjurious — his plea colloquy or his proffered testimony contradicting it. The parties significantly disagree in their briefing about which of Cataquet's accounts is true. *Compare* (Gov. Brief in Opp. 20–22), *with* (Def. Reply Brief 4–5, ECF No. 73.) That disagreement is unsurprising given that Cataquet's anticipated testimony would have tended to exculpate Ortiz and contradict the mountain of evidence introduced by the Government at trial. *See supra* Part I. To resolve the disagreement, the Court would have essentially had to take a position on the ultimate issue: did Cataquet act alone or with Ortiz? That would have necessitated briefing, argument and probably an evidentiary hearing. *See Whittington,* 783 F.2d at 1218 (noting with approval the district court's use of *in camera* hearing to determine witness's entitlement to Fifth Amendment privilege in similar circumstances). Again, the defense raised none of this at the time.

The Court would have also had to resolve whether Cataquet's prior statement to McGinn was admissible under Rules 804(a) and 804(b)(3), *see infra* Section II.C.2, because if Cataquet couldn't take the Fifth, Ortiz wouldn't have bothered with the plan at all. *See* (Tr. Jury Trial Dec. 11 at 14:9–11 ("I'm not going to put him on the stand and . . . elicit this testimony because one or the other is perjury.")) That determination requires evaluating the "trustworthiness" of Cataquet's statement, *see* Fed. R. Evid. 804(b)(3), which the defense only addressed for the first time at the end of its post-trial *reply* brief, (Def. Reply 5–8).

The defense knew all these issues needed to be worked out before proceeding because the Court repeated them several times.  (Tr. Jury Trial Dec. 11 at 17:25–16:7, 20:10–21:13, 30:12–31:5, 37:5–39:5.)  And the defense knew that the Court did not yet fully understand those issues and was not ready to rule — if not because a reasoned ruling would have been impossible under the circumstances, then because the Court said so on the record.  Indeed, after counsel said "understanding how Your Honor has ruled here —," the Court interjected: "What do you mean how I've ruled?"[11]  (*Id.* at 41:3–5.)[12]  Having fallen short of its obligation to support its proposed course of action with legal authority and argument, the defense cannot now construe the Court's skepticism of that request as a "ruling" that "forced" them to "abandon Ms. Ortiz's theory of defense."  (Def. Reply 4.)  Any experienced trial attorney knows full well what a "ruling" is and isn't.  And lawyers who intend to see their strategy through will stick with it, let the chips fall where they may and then appeal if necessary the actual rulings they don't like.

The defense did not do that.  Counsel abandoned an ill-thought-out gambit after realizing the issues it raised and the chaos it caused.  Ortiz cannot now, perhaps regretting her lawyers' surrender, claim that the Court committed an "error" that the "interests of justice" require fixing.  *See* Fed. R. Crim. P. 33; *cf. Freytag v. Comm'r*, 501 U.S. 868, 895 (1991) ("The very word 'review' presupposes that a litigant's arguments

---

[11]     This was not the first time defense counsel incorrectly assumed or suggested that the Court had already ruled on something.  *See* (Tr. Jury Trial Dec. 10 at 223:24–224:4.)

[12]     Ortiz also points to the Court's later references to the Government "pulling out all the guns" against Cataquet as evidence that the Court ruled on where Cataquet would take the Fifth.  (Def. Mot. 13.)  But the Government's metaphorical "guns" included evidence like Cataquet's plea statement, which would have contravened his testimony and/or his prior statement to McGinn.

have been raised and considered in the tribunal of first instance.  To abandon that principle is to encourage the practice of 'sandbagging': suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later — if the outcome is unfavorable — claiming that the course followed was reversible error.") (Scalia, J. concurring); Wright and Miller § 5032 ("Under our system of review for error, until the trial judge makes some ruling admitting or excluding evidence, the losing party has nothing to appeal.").[13]

2

Even assuming the Court had ruled as Ortiz postulates — that if Cataquet wanted to invoke his Fifth Amendment privilege, he had to do so in front of the jury — a new trial would still be unwarranted for at least two reasons.

i

First, a jury-facing invocation of the Fifth Amendment is not automatically grounds for a new trial, and the circumstances that would necessitate one are not present here.  A new trial is warranted only when the prosecution's case is materially and unduly strengthened by prejudicial inferences following from the witness's invocation of the privilege.  *Namet v. United States*, 373 U.S. 179, 186 (1963); *see also Williams v. Gov't of Virgin Islands*, 271 F. Supp. 2d 696, 710 (D.V.I. 2003).  That determination is highly fact-bound, requiring the Court to examine both the propriety of calling the witness despite the likelihood that he will invoke the privilege and the

---

[13]    Ortiz could of course argue that her lawyers' decision to pull the plug on the plan constituted ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984).  But that issue isn't properly adjudicated in a Rule 33 posture. *See U.S. v. Jake*, 281 F.3d 123, 132 n.7 (3d Cir. 2002).  And such an argument would likely fail given the fact that Cataquet's statement would have been inadmissible. *See infra* Section II.C.2.ii; *United States v. Bui*, 795 F.3d 363, 366–67 (3d Cir. 2015) (holding counsel cannot be found to be ineffective for failing to pursue a meritless claim).

impact of the invocation on the case. *See Namet*, 373 U.S. at 186. For example, where the prosecutor has a permissible reason to call a witness and the witness only invokes the privilege in response to a small number of questions, those "minor lapses" will not merit reversal. *Id.* at 188–89. By contrast, reversal is warranted where a witness invokes his privilege on the stand after the prosecutor reads into the record, and asks the witness to confirm, a prior statement he made bearing on a fundamental issue in the case. *Douglas*, 380 U.S. at 420 (holding these circumstances violated defendant's Confrontation right).

The prosecution's case against Ortiz was, of course, *not* strengthened by inferences arising out of Cataquet's invocation of privilege in front of the jury, given that the defense abandoned its strategy and no one called him. And the Court is in no position to hypothesize about whether the prosecution's case would have been unduly strengthened if Cataquet had taken the Fifth in front of the jury pursuant to the Court's "ruling." Indeed, following the Supreme Court's reasoning in *Luce v. United States*, appellate courts frequently refuse to review conditional trial rulings unless the party against whom the trial court ruled actually took the action that would trigger the condition. *See* 469 U.S. at 41 (explaining that "reviewing court[s are] handicapped in any effort to rule on subtle evidentiary questions outside a factual context" and holding that *in limine* rulings under Evidence Rule 609(a)(1) are not reviewable if the defendant does not testify); *see also, e.g.*, *United States v. Moskovits*, 86 F.3d 1303, 1304 (3d Cir. 1996) (extending *Luce*'s reasoning and declining to review conditions district court placed on defendant's "right to testify in his own defense" because the defendant did not take the stand, so "any possible harm flowing from the conditions . . . is

speculative and cannot be evaluated in relation to the record as a whole"); *United States v. Wilson*, 307 F.3d 596, 600–01 (7th Cir. 2002) (extending *Luce* and declining to take up defendant's argument that the district court violated his Fifth Amendment rights by ruling that the Government could introduce evidence of the defendant's silence if the defendant first introduced other evidence).

And many of the dangers identified in *Luce* and its progeny are present here.  As in *Luce*, a new trial is only warranted if the challenged ruling unduly prejudiced the defendant.  *See* 469 U.S. at 41; *Namet*, 373 U.S. at 186.  And any prejudice from the challenged ruling is "wholly speculative" because the Court retained discretion to alter its "ruling" (and likely would have done so here if presented with adequate briefing and argument, *see supra* n.9), there is no way of knowing whether the Government would have taken advantage of the Court's "ruling" (doubtful if counsel for the Government had an opportunity to research the issue), and there is no way of knowing whether the defense's decision not to pursue its strategy was attributable to the Court's "ruling." *See Luce*, 469 U.S. at 41–42.  Plus, granting a retrial where a defendant never actually calls the witness who might invoke his privilege would encourage future defendants to "'plant' reversible error in the event of conviction."  *See id.* at 42.

ii

Second, a new trial is not in the interests of justice because Cataquet's prior statement purporting to take responsibility for the scheme was not admissible under Rule 804(b)(3).  Thus, there was no reason for Cataquet to invoke his Fifth Amendment privilege, so the Court's purported "ruling" with respect to where Cataquet could do so

could not have "had a substantial influence on the outcome of the trial." *Greenspan*, 923 F.3d at 154.

Rule 804(b)(3) provides an exception to the rule against hearsay for "statements against [the declarant's] interest" when the declarant is unavailable to testify at trial. The exception is properly invoked in a criminal trial only if the statement offered is (1) so contrary to the declarant's interest that he would not have reasonably made it unless it was true, and (2) "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3). The second criterion would have doomed the statement's admissibility.

Courts must "assess corroboration in light of the totality of circumstances," *United States v. Caldwell*, 760 F.3d 267, 289 (3d Cir. 2014), evaluating both "the context in which the statement was made" (i.e., the declarant's incentives for making the statement), and the content of the statement itself, *United States v. Boyce*, 849 F.2d 833, 836 (3d Cir. 1988). Some factors that suggest trustworthiness include the lack of a close relationship between the declarant and the accused, the fact that the declarant would not curry favor with the Government by making the statement, the fact that the declarant made the statement to the Government and not the defense, the fact that the declarant was not yet under investigation when he made the statement, *Caldwell*, 760 F.3d at 289–90, the existence of independent evidence corroborating the declarant's statement, *Staruh v. Superintendent Cambridge Springs SCI*, 827 F.3d 251, 259–60 (3d Cir. 2016), and the consistency of the declarant's story over time, *United States v. Browne*, No. 23-1925, 2024 WL 3326081, at *1 (3d Cir. July 8, 2024).

The circumstances here cut squarely against the trustworthiness of Cataquet's statement.  Most obviously, when Cataquet made the statement, he and Ortiz were in a romantic relationship and Ortiz was pregnant with his child.  (Def. Reply Ex. A, ECF No. 73–1); (Def. Mot. Ex 1); (Tr. Jury Trial Dec. 11 at 26:7–16.)  And Ortiz is not a United States citizen, so a conviction raises potential immigration consequences for her, *see* (Gov. Resp. in Opp'n 25 n.4, ECF No. 65), while Cataquet has no such worries, *see* (Cataquet PSR, docket No. 24-123.)  It's hard to imagine many greater incentives to take sole blame for a two-person crime than preventing one's romantic partner and co-parent from being imprisoned and possibly deported — with the possibility that the child would go with her.

In addition, Cataquet's story changed over time.  In his February 2023 statement to Agent McGinn, Cataquet claimed that the scheme was his idea and his doing, (Def. Mot. Ex. 1), then he agreed during his plea colloquy that Ortiz was a co-participant, *see* (Tr. Jury Trial Dec. 11 at 9:22–10:4), and then he apparently flipped again and told Ortiz's defense lawyers that the scheme was his alone, (*id*. at 10:18–25).  Cataquet was also already under investigation at the time he made the February 2023 statement. Indeed, in part of Agent McGinn's 302 Report that the defense never mentioned, McGinn states that he told Cataquet he would receive a "Target Letter."  (Def. Mot. Ex. 1.)  So there was no risk that Cataquet would attract new attention from law enforcement.  And Cataquet's statement not only lacks corroboration by independent evidence, it's also contradicted by the trial evidence.  For example, he stated that he set up all the email accounts used in the scheme, (*id*.), yet the Government demonstrated at trial that Ortiz's iCloud account Rashell_Ortiz24@iCloud.com was used for numerous

parts of the scheme, and that account was created long before the scheme began. (Trial Ex. 602-1, 404–07); (Tr. Jury Trial Dec. 11 at 181:8–183:14, 187:6–188:22 191:8–193:18.)

Ortiz suggests that Cataquet's statement is trustworthy because it was not made to curry favor with the Government and indeed implicated him in a "serious crime that he surely knew carried grave consequences." (Def. Reply in Support 7.) She says this fact is crucial because the trustworthiness requirement exists to combat the risk that "third part[ies] with *less risk of prosecution* will fabricate a confession to exculpate the guilty party." (*Id.* at 8 (quoting *Caldwell*, 760 F.3d at 289.)) But again, Cataquet is not at risk of being deported, and Ortiz is. So Cataquet *did* face less risk than Ortiz. Plus, nothing indicates that Cataquet ever actually planned to contest his guilt, suggesting that he never had any real reason to worry about incriminating himself. He told Agent McGinn and Detective Larkin that he "knew the day would come when he would be confronted by law enforcement," and that he "knew what he did was wrong." (Def. Mot. Ex. 1.) And he never stood trial for his part in the scheme, quickly pleading guilty to an information. Cataquet had little reason to worry about his own prosecution, and every reason to worry about Ortiz's.

Because Cataquet's prior statement was inadmissible, there was no reason for Cataquet to invoke his Fifth Amendment privilege, so any purported ruling about how and where Cataquet would do so could not have influenced the trial.

An appropriate Order follows.

BY THE COURT:


_/s/ Gerald J. Pappert_

Gerald J. Pappert, J.